BRADFORD COLLINS AND CO., INC. Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bradford Collins & Co. v. Commissioner
Docket No. 17346-79.
United States Tax Court
T.C. Memo 1982-413; 1982 Tax Ct. Memo LEXIS 335; 44 T.C.M. (CCH) 546; T.C.M. (RIA) 82413; July 21, 1982. Marc Sterling (an officer), for the petitioner. Michael R. Morris, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioner's 1971 and 1974 Federal corporate income tax of $22,167 and $1,576, respectively. The sole issue for decision is whether petitioner realized an ordinary or capital loss upon the sale of 45,000 shares of Banner Industries, Inc. stock in 1974. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner is a New York corporation. It maintained its principal place of business in Los Angeles, California, *337 at the time the petition in this case was filed. Petitioner filed its Federal corporate income tax returns for 1971 and 1974 with the Internal Revenue Service Center, Fresno, California. Petitioner is a financial consultant to other corporations, assisting in corporate mergers and acquisitions. Through its president and sole stockholder, Marc Sterling (hereinafter Sterling), petitioner acts as a finder, bringing together companies which are interested in undergoing mergers or acquisitions. Petitioner's business is such that it may be working on 20 deals over a period of 2 or 3 years, and only close 1 or 2 such deals. As compensation for its services, petitioner is paid a finders fee, sometimes in cash, sometimes in the form of stock. In 1968, petitioner learned through its president, Sterling, that Patterson Industries, Inc. (hereinafter Patterson), was interested in acquiring or merging with a publicly held corporation. Petitioner, acting as an intermediary, located Banner Industries, Inc., and brought this company to the attention of Samuel J. Krasney (hereinafter Krasney), the president of Patterson, as a possible merger candidate. In 1968, Patterson was merged into Banner. *338 At the time of such merger, Patterson was a profitable manufacturer of chemical processing equipment, and Banner was a discount store chain that had lost money for the previous five years and was scheduled to be delisted from the American Stock Exchange. After the merger, Krasney became Banner's president and chairman of the board, and he informed Sterling that he wanted to build up Banner in size and profitability by acquiring profitable companies. Banner did not have sufficient cash to compensate petitioner for its role as a finder in the aforementioned merger and, consequently, petitioner agreed to and did receive 45,000 shares of Banner stock as compensation for such role. The Banner stock was received by petitioner in 1968 after the merger. As a condition to receiving such stock, petitioner had signed an "investment letter" stating generally that petitioner was accepting the stock for investment purposes and not for resale in the public market. In addition, this restriction against selling to the public (hereinafter sometimes referred to as the resale restriction) was stamped on the Banner stock which petitioner received. Due to the resale restriction, petitioner did not *339 report its receipt of the Banner stock as income on its 1968 return. In 1971, the resale restriction was removed and petitioner reported $253,125 as ordinary income from its receipt of the Banner stock on its return for that year. Prior to 1971, petitioner had attempted on many occasions to get the resale restriction removed by having Sterling both talk to Banner's attorney, and write to the Securities and Exchange Commission. On November 26, 1973, Banner's Board of Directors authorized Banner to repurchase 100,000 shares of its outstanding stock. At the time of this authorization, Banner had approximately 4 1/2 million shares of its stock outstanding. During the period from January of 1974 until March of 1977, Banner's Board of Directors authorized Banner to repurchase 1/2 million shares of its outstanding stock. Krasney asked petitioner if Banner could acquire petitioner's 45,000 shares of Banner stock. In addition to asking petitioner to sell its large block of Banner stock to Banner, Krasney asked other persons owning large blocks of Banner stock if they would sell them to Banner. Dur to petitioner's desire to maintain an ongoing business relationship with Banner, petitioner *340 sold its 45,000 shares of Banner stock to Banner for $129,000 in 1974. [1] Although petitioner incurred a loss of $124,125 on such sale, petitioner believed that it would be doing further business with Banner, and that this loss would hopefully be recouped as a result of such other business. Beginning in 1968, when petitioner served as a finder in the Patterson-Banner merger, through 1975, Sterling and Krasney, on behalf of their respective companies, maintained an ongoing and continuous business relationship. During this period, Sterling presented approximately 15 companies to Krasney as potential acquisition candidates for Banner. In 1975, Sterling's efforts helped Banner make another acquisition. On its 1974 return, petitioner claimed a $124,125 ordinary loss based on the sale of its Banner stock, which resulted in a $124,125 net operating loss for such year. Petitioner carried back this net operating loss to 1971 and was allowed a tentative refund pursuant to the tentative overassessment *341 adjustment procedure set forth in section 6411(b). In the notice of deficiency, respondent determined that petitioner's claimed $124,125 ordinary loss should have been claimed as a capital loss because petitioner did not establish that the Banner stock was held "primarily for business." Consequently, respondent increased petitioner's taxable income by $124,125 for 1974, and allowed petitioner a capital loss carryback to 1971 in lieu of petitioner's claimed net operating loss carryback. As a result of these adjustments, respondent determined the above stated deficiencies in petitioner's 1971 and 1974 corporate income tax. OPINION We must determine whether the loss incurred by petitioner on the sale of its Banner stock was ordinary or capital. Such a determination depends upon whether the Banner stock held by petitioner constituted capital assets. Section 1221 [2] defines the term "capital asset" to mean property held by the taxpayer with the exception of five types of property enumerated therein. [3] Although the Banner stock held by petitioner does not fall within any of these five statutory exceptions, there is a recognized judicial exception to the term "capital asset" which *342 we need to consider. *343 In , the Supreme Court held that the term "capital asset" excludes items in addition to those specifically excluded from the term "capital asset" as defined in section 1221. The taxpayer in Corn Products Refining Co. was a manufacturer of corn products who purchased and sold corn futures on a commodities exchange as hedging transactions. In holding that these corn futures were not capital assets in the taxpayer's hands, the Supreme Court stated: Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in [sec. 117(a)]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. . Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § *344 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." . Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See ; . [fn. omitted.] . The Corn Products doctrine has been applied by this Court and others in many cases, including situations where corporate securities were acquired and held by taxpayers for business rather than investment reasons. Business reasons are found to exist if securities are purchased by a taxpayer "as an integral and necessary act *345 in the conduct of his business," and they "continue to be so held until the time of their sale." . See also (law partnership that claimed an ordinary loss on the sale of corporate stock, which was originally acquired to secure the legal work of that corporation, had to prove, inter alia, that its purchase of the stock was necessary for the acquisition of the corporation's legal business); . Moreover, even if the taxpayer's acquisition and retention of corporate stock is found to be "predominantly business-motivated," such stock will nevertheless be considered a capital asset whenever a substantial, albeit secondary, investment motive is found to exist. , app. dismissed, , cert. denied ; . In the instant case, petitioner argues that *346 it is entitled to an ordinary loss with respect to the sale of its Banner stock in 1974, because it acquired and held the stock in order to foster a continuing business relationship with Banner. Respondent, on the other hand, maintains that petitioner did not hold the stock primarily for business reasons, and that under our opinion in , the Banner stock was a capital asset in petitioner's hands. For reasons stated below, we hold for respondent. The difficulty with petitioner's position is that the record simply does not support a conclusion that petitioner's retention of the Banner stock was an integral and necessary act in order for petitioner to foster an ongoing business relationship with Banner. Although petitioner has not claimed that it felt compelled to accept Banner's offer of its stock as petitioner's finders fee, it is certainly conceivable that petitioner accepted such stock in order not to offend Banner and thus dampen petitioner's prospects for future business with the company. Nevertheless, when the resale restriction was lifted from petitioner's Banner stock in 1971, there is nothing in the record which suggests that *347 petitioner needed to retain ownership of the stock in order to maintain its business relationship with, and to secure future business from, Banner. Indeed, prior to the time when the resale restruction on petitioner's Banner stock was lifted, petitioner had attempted on many occasions to get that restriction lifted. Petitioner's attempts included having Sterling speak with Banner's attorney and write to the Securities and Exchange Commission. We do not think that petitioner would have undertaken such efforts if it felt compelled to retain Banner's stock. Moreover, although Banner never requested petitioner to retain the Banner stock after the resale restriction was lifted, petitioner continued to hold such stock until sometime in 1974, when petitioner sold the shares to Banner pursuant to Krasney's request. While we recognize that petitioner may have believed its business relationship with Banner could be threatened if it had refused Krasney's request, our concern is not with why petitioner sold its Banner stock, but why petitioner retained such stock up until the time of this sale. ; . *348 Since petitioner has not established that it had any business reason for holding its Banner stock we must conclude that petitioner's loss on such sale was a capital one. See secs. 165(f), 1211, 1212, and 1222. Moreover, even if petitioner had established a business reason for retaining the Banner stock, petitioner would have to show that it did not also have a substantial investment motive in order to prevail in the instant case. At the time of the Patterson-Banner merger, Krasney informed petitioner that he was very optimistic about Banner's future. Since petitioner continued to hold Banner's stock for a considerable time after the resale restrction was lifted we think that it is probable that petitioner shared Krasney's optimism with respect to Banner's future. Consequently, petitioner has simply failed to establish on this record that its retention of the Banner stock was not due, at least in part, to substantial investment motives. See . To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. At the time of this sale, Banner was listed on the American Stock Exchange. In December of 1977, Banner became listed on the New York Stock Exchange, where it is currently listed.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
3. SEC. 1221. CAPITAL ASSET DEFINED. [T]he term "capital asset" * * * does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by-- (A) a taxpayer whose personal efforts created such property, (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B); (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩